[L. A. No. 29493. In Bank. Mar. 14, 1968.]

WHITE LIGHTING COMPANY, Plaintiff, Cross-defendant and Respondent, v. JAMES A. WOLFSON, Defendant, Cross-complainant and Appellant; SAMUEL SHAFT et al., Cross-defendants and Respondents.

Richard A. DeSantis and DeSantis & Gordon for Defendant, Cross-complainant and Appellant.

Staitman & Snyder and Jack M. Staitman for Plaintiff, Cross-defendant and Respondent and for Cross-defendants and Respondents.

TOBRINER, J.—Although it discusses other matters, this opinion sets forth three principal rulings: first, that the statute of frauds does not apply to an oral employment contract, even though it provides in part for the measurement of the employee's compensation by annual receipts of the employer, unless its terms foreclose the employee's completion of the performance of the contract within one year; second, that the statute of frauds does not apply to an oral contract in its entirety if the court by reference to the terms of the agreement can separate those promises of performance not falling within the statute from those that do so; third, that a claim based on excessive attachment constitutes a cause of action for abuse of process rather than for malicious prosecution and such a claim may be brought in the action in which the attachment issued.

Plaintiff White Lighting Company, hereinafter "White," sued defendant Wolfson to recover $850 for money due and owing. Wolfson denied the indebtedness and filed his first cross-complaint against White, Shaft (the president, controlling owner, and a director of White), Beber (an officer and director of White), and Basin (a corporation) on November 9, 1964. The cross-complaint alleged in substance that Wolfson and cross-defendants entered into an oral employment contract which obligated White to employ Wolfson on a "permanent" basis; that in connection with it Wolfson had been fraudulently induced to buy 5,000 shares of White stock from cross-defendant Basin; that the sale of the White shares violated section 5 of the 1933 Securities Act; and that White and cross-defendants Shaft and Beber had breached an oral termination of employment agreement. The trial court sustained general and special demurrers to the cross-complaint with leave to amend.

The first amended cross-complaint added as a fourth cause a common count in quantum meruit for the reasonable value of the services rendered by Wolfson to White. The trial court again sustained general and special demurrers with leave to amend.

The second amended cross-complaint contained five counts. The trial court sustained general demurrers to the first count

(oral employment contract), the second count (oral termination of employment contract), the fourth count (common count in quantum meruit), and the fifth count (excessive attachment by White allegedly constituting abuse of process) *without* leave to amend. A general demurrer *with* leave to amend was sustained as to the third count (the Securities Act violation).

Wolfson's third amended cross-complaint alleged in two counts the Securities Act violation alleged in the third count of his second amended cross-complaint. The first count alleged that the sale to Wolfson of the 5,000 White shares violated section 5 of the 1933 Securities Act, and the second count alleged that cross-defendants Shaft and Basin had fraudulently induced Wolfson to buy the shares. The trial court sustained general and special demurrers without leave to amend and granted a motion to strike the third amended cross-complaint. The trial court then dismissed defendant's action on the cross-complaint.[1]

We shall explain why we have concluded that the trial court erred in sustaining general demurrers without leave to amend to the first, second, fourth, and fifth counts of the second amended cross-complaint. The causes of action alleged in the first two counts are not barred by the statute of frauds; the fourth count is not demurrable; the cause of action for abuse of process alleged in the fifth count is not premature. The court also erred in striking the third amended cross-complaint on the ground of failure to comply with section 442 of the Code of Civil Procedure; and, as to cross-defendants Shaft and Basin, the court erred in sustaining without leave to amend the demurrers to the two counts of the third amended cross-complaint.

1. *The statute of frauds does not apply to an oral employment contract, even though it provides in part for the measurement of the employee's compensation by annual receipts of the employer, unless its terms foreclose the employee's completion of the performance of the contract within one year.*

Wolfson alleged as the first count of the second amended cross-complaint that during October 1963 cross-defendants

---

[1]Wolfson appeals from the judgment of dismissal entered following the order sustaining general demurrers without leave to amend to the first, second, fourth, and fifth counts of the second amended cross-complaint and the two counts of the third amended cross-complaint.

promised him that if he would continue with White as vice president and sales manager he would receive a salary of $300 per week, automobile and other business expenses, and one percent of the annual gross sales of White exceeding one million dollars per year, payable quarterly commencing November 1, 1963. Although Wolfson relied to his detriment on these oral representations and performed all the conditions, cross-defendants refused not only to comply with the promise as to the percentage of gross receipts but also to give Wolfson any information by which he could determine if any amount was owing to him. Although Wolfson's employment was to be on a "permanent" basis, it was not to continue for any specified period. To this count the trial court sustained a general demurrer without leave to amend on the ground that the alleged oral employment contract violated the statute of frauds. (Civ. Code, § 1624, subd. 1.)

█ Even though part of an employee's compensation is to be measured by annual receipts of the employer, the statute of frauds does not apply to an employment contract unless its terms provide that the employee cannot completely perform it within one year from the making of the contract. Civil Code section 1624, subdivision 1, invalidates "an agreement that by its terms is not to be performed within a year from the making thereof" unless the contract "or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent." The cases hold that section 1624, subdivision 1, applies only to those contracts which, by their terms, cannot possibly be performed within one year (E.g., *Hollywood Motion Picture Equipment Co.* v. *Furer* (1940) 16 Cal.2d 184, 187 [105 P.2d 299]; *Keller* v. *Pacific Turf Club* (1961) 192 Cal.App.2d 189, 195-196 [13 Cal.Rptr. 346].)[2]

█ The contractual provision that Wolfson would receive one percent of the annual gross sales of White exceeding one

---

[2]"In its actual application, however, the courts have been perhaps even less friendly to this provision [the "one year" section] than to the other provisions of the statute [of frauds]. They have observed the exact words of this provision and have interpreted them literally and very narrowly. . . . To fall within the words of the provision, therefore, the agreement must be one of which it can truly be said *at the very moment it is made,* 'This agreement is not to be performed within one year'; in general, the cases indicate that *there must not be the slightest possibility that it can be fully performed within one year.*" (Italics added.) (2 Corbin on Contracts, § 444, at pp. 534-535.)

million dollars per year does not in itself convert the oral employment contract into one which by its terms cannot be performed within a year. Decisions involving other oral employment contracts with similar terms as to compensation support this conclusion. Thus the statute of frauds does not apply to employment contracts for an indefinite period merely because the contract provides that payment will be forthcoming on termination of the employment relationship. (*Lloyd* v. *Kleefisch* (1941) 48 Cal.App.2d 408, 414 [120 P.2d 97].) Nor does the statute of frauds apply to employment contracts because the compensation for the services is to be measured by their value to the employer over a period of more than one year. (*Reed Oil Co.* v. *Cain* (1925) 169 Ark. 309 [275 S.W. 333].) Moreover, in *Pecarovich* v. *Becker* (1952) 113 Cal.App. 2d 309, 315-316 [248 P.2d 123], the court held that the statute of frauds does not apply to an oral contract relating to the services and annual salary of a football coach for a three-year period; the court explained that the contract authorized the employer to terminate the employment relationship at the end of each year by payment of a named sum.

Our conclusion coincides with the position unanimously taken by the few courts that have dealt with oral employment contracts involving bonus or profit-sharing provisions. Thus in *Dennis* v. *Thermoid Co.* (1942) 128 N.J.L. 303, 305 [25 A.2d 886], the court held that a provision for a bonus payable at the end of the year did not render an oral employment contract not performable within that year.[3]

Since in the instant case the alleged oral contract may be terminated at will be either party, it can, under its terms, be performed within one year. When Wolfson's employment relationship with White was terminated, Wolfson had completely performed; White's performance consisted of nothing more than compensating Wolfson. (See *Roberts* v. *Wachter* (1951) 104 Cal.App.2d 271, 280-281 [231 P.2d 534].) Moreover, as we have explained, the inclusion of the provision for a bonus ascertainable only after one year does not invalidate the oral agreement under the statute of frauds.

[3] "The circumstance that the amount of the yearly bonus could not be figured till after the books were closed after the first of the next year did not bring the agreement within the bar of [the statute of frauds]. The work called for by the agreement was all performed within the year. The salary was all earned." (*Id.* at p. 305.) (See also, *Hartung* v. *Billmeier* (1954) 243 Minn. 148 [66 N.W.2d 784]; *Zwolanek* v. *Baker Mfg. Co.* (1912) 150 Wis. 517 [137 N.W. 769, 44 L.R.A. N.S. 1214, Ann. Cas. 1914A 793].)

2. ■ *The statute of frauds does not apply to an oral contract in its entirety if the court by reference to the terms of the agreement can separate those promises of performance not falling within the statute from those that do so.*

Wolfson cross-complained that during the month of June 1964 Beber requested his resignation as vice president of White, and that consequently he entered into an oral settlement agreement with Beber and Shaft acting as agents of White. Pursuant to this oral contract, Beber, Shaft, and other undisclosed associates were to purchase from Wolfson the 5,000 White shares for a total sum of $15,000, and White was to pay Wolfson $1,200 for moving expenses to Chicago, one month's severance pay in the sum of $1,200, and the share of the gross receipts due him for the period of employment from October 1, 1963, to July 15, 1964. Yet White has paid Wolfson only $600 representing two weeks' severance pay.

■ The trial court sustained a general demurrer without leave to amend to this count on the ground that the alleged oral termination of employment contract violated the "sale of goods" section of the statute of frauds. (Former Civ. Code, §§ 1624a, subd. (1), 1724, subd. (1).) The trial court properly concluded that the alleged "repurchase" agreement falls under the applicable "sale of goods" section of the statute of frauds because it constitutes "a contract to sell and deliver stock in a corporation of the value of $500 or upwards. . . ." (*Berkey* v. *Halm* (1950) 101 Cal.App.2d 62, 67 [234 P.2d 885].)[4]

The trial court erred, however, in relying upon the statute of frauds to sustain a general demurrer to the *entire* second count. ■ If a claimant alleges two or more promises of performance "that can easily be distinguished and separated by the court by reference to the agreement itself" (2 Corbin on Contracts, § 313, at pp. 127-128), only that promise of performance which falls clearly within the statute of frauds cannot be enforced. (2 Corbin, *op. cit. supra,* at pp. 124-127; *Pollyanna Homes, Inc.* v. *Berney* (1961) 56 Cal.2d 676, 678 [16 Cal.Rptr. 345, 365 P.2d 401].)

---

[4]Although Wolfson could nevertheless recover on the alleged "repurchase" of stock agreement if cross-defendants were estopped to assert the statute of frauds, we find no estoppel here. Wolfson does not allege any facts showing that an unconscionable injury to Wolfson or unjust enrichment of cross-defendants would result from the nonenforcement of the alleged "repurchase" agreement. (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 625 [220 P.2d 737].)

▇ Here, by reference to the alleged agreement itself, the ''repurchase'' promise can be clearly distinguished and separated from the promises to pay one month's salary, traveling expenses, and Wolfson's share of the gross receipts accrued during his period of employment as vice president. Any other construction of the alleged oral termination of employment contract would transgress the policy of restricting the application of the statute of frauds exclusively to those situations which are precisely covered by its language. (*Sunset-Sternau Food Co.* v. *Bonzi* (1964) 60 Cal.2d 834, 838 [36 Cal.Rptr. 741, 389 P.2d 133].)

3. *The court erred in sustaining a general demurrer to Wolfson's common count in quantum meruit on the asserted ground that Wolfson sought the same compensation as that alleged in the two counts on the express contracts.*

Wolfson alleged that between October 1, 1963, and July 15, 1964, he rendered services to White as a vice president and sales manager at the request of Shaft and Beber acting as agents of White. Wolfson further alleged that the reasonable value of his services was $25,000, and that White had paid him only $11,400.

▇ In sustaining a general demurrer without leave to amend to this count on the ground that Wolfson sought the same compensation alleged in the two express contract counts, the trial court erred. As a general rule, a demurrer will lie to a common count based on the same facts as a specific count alleging an express contract if the specific count does not state a cause of action. This rule does not apply, however, to the case in which a general demurrer lies to the specific count on the ground of the statute of frauds. (*Parker* v. *Solomon* (1959) 171 Cal.App.2d 125, 136 [340 P.2d 353].) ''In this respect there is a distinction between a count which fails to state facts sufficient to establish the existence of a contract and one which pleads a contract which is unenforceable because it is not in writing.'' (*Leoni* v. *Delany* (1948) 83 Cal.App.2d 303, 306-307 [188 P.2d 765, 189 P.2d 517].)

▇ Moreover, the trial court sustained a demurrer to the common count only because of its relationship to the first two counts in which Wolfson, pursuant to alleged express oral contracts, sought compensation for his services. Since the trial court erred in sustaining a general demurrer to the first count and the entire second count, the demurrer to the common count cannot stand.

*4. A claim based on excessive attachment constitutes a cause of action for abuse of process rather than for malicious prosecution and such a claim may be brought in the action in which the attachment issued.*

Wolfson added to his second amended cross-complaint a fifth count entitled "Abuse of Process." Wolfson alleged that White, in its action to recover $850 from Wolfson, procured issuance of process against Wolfson and that cross-defendants "maliciously, wilfully and with the intent solely to vex, harass and injure" used the process to attach both Wolfson's 5,000 White shares (allegedly worth $15,000) and his 1963 Porsche automobile (allegedly worth $4,500). Cross-defendants likewise attempted to attach Wolfson's bank account ($250). Cross-defendants threatened Wolfson that they would garnish his wages (allegedly in excess of $200 per week). Cross-defendants knew that the assets which they attached and attempted to attach bore no relation to the sum of White's claim against Wolfson; cross-defendants sought the above attachments to restrain Wolfson by extortion from bringing his cross-claims. As a result of the actual and attempted attachments, Wolfson lost the use of his car for one month with resulting loss of commissions, suffered impairment of his credit with his bank which accelerated a loan made to Wolfson, and incurred legal expenses in procuring the release of the attached assets.

The trial court erred in sustaining a general demurrer without leave to amend to this fifth count of the second amended cross-complaint on the asserted ground of the prematurity of the cause of action. A claim based on excessive attachment constitutes in essence a cause of action for abuse of process rather than a cause of action for malicious prosecution "Consequently . . . it is unnecessary for [Wolfson] to prove that the proceeding [in which the attachment was issued] has terminated in his favor, or that the process was obtained without probable cause or in the course of a proceeding begun without probable cause." (Prosser, Torts (3d ed. 1964), § 115, pp. 876-877; *Spellens* v. *Spellens* (1957) 49 Cal. 2d 210, 232 [317 P.2d 613].) The claim may therefore be brought in the same action in which the attachment issued.

The case law on wrongful attachment presents a complicated and confused picture. Most of the California opinions have treated suits for wrongful attachment as actions for

malicious prosecution[5] rather than for abuse of process.[6] Much of the confusion in the characterization of these actions for wrongful attachment results from the courts' failure to distinguish the following four different types of wrongful attachment: (1) levying attachment in an action prosecuted maliciously and without probable cause; (2) maliciously procuring attachment in a properly instituted action in which the

---

[5]E.g., *Goland* v. *Peter Nolan & Co.* (1934) 2 Cal.2d 96 [38 P.2d 783] (attachment maliciously procured in an action prosecuted maliciously and without probable cause); *Crews* v. *Mayo* (1913) 165 Cal. 493, 495 [132 P. 1032] (attachment procured maliciously in an action prosecuted maliciously and without probable cause: "where the malicious *issuance* of the process is the gist of the action, [the action is like one for malicious prosecution, and therefore] a termination of the suit in which the process was issued must be proven."); *Vesper* v. *Crane Co.* (1913) 165 Cal. 36, 41 [130 P. 876, L.R.A. 1915A 541] (attachment maliciously procured in an action prosecuted maliciously and without probable cause: "The action to recover damages from the attachment plaintiff for *the mere wrongful issuance and levy of an attachment* is analogous to the ordinary action for malicious prosecution . . . ." [italics added]); *Clark* v. *Nordholt* (1898) 121 Cal. 26, 28 [53 P. 400] ("If a person having a good cause of action against another wilfully sues for a much greater amount than is due, and attach the property of the other, and put him to charges, he is liable [therefor in an action for malicious prosecution]"); *King* v. *Montgomery* (1875) 50 Cal. 115 (attachment procured maliciously in an action in which the attachment defendant prevailed); *Coy* v. *Advance Automatic Sales Co.* (1964) 228 Cal.App.2d 313 [39 Cal. Rptr. 476, 9 A.L.R.3d 678] (excessive claim and attachment for an improper purpose, and subsequent levy upon attachment defendant's property valued far in excess of the alleged excessive amount for which the writ of attachment was issued); *Division of Labor Law Enforcement* v. *Barnes* (1962) 205 Cal.App.2d 337, 346 [23 Cal.Rptr. 55] (attachment allegedly "unjustified" and "exceeded [plaintiffs'] scope of authority": "damages arising by reason of an alleged wrongful attachment levied on [defendant's] property in the same action may not be pleaded in a cross-complaint . . . ."); *Campbell* v. *White* (1962) 199 Cal.App.2d 382 [18 Cal.Rptr. 628] (alleged malicious attachment of wages); *Merron* v. *Title Guarantee & Trust Co.* (1938) 27 Cal.App.2d 119, 122 [80 P.2d 740] ("the gist of the action is the alleged wrongful and malicious issuance and levying of the attachment"); *Harris* v. *Harter* (1926) 79 Cal.App. 190 [249 P. 39] (excessive attachment).

[6]E.g., *Spellens* v. *Spellens, supra*, 49 Cal.2d 210 (claim and delivery writ used to coerce plaintiff to drop her main action); *Fairfield* v. *Hamilton* (1962) 206 Cal.App.2d 594, 603 [24 Cal.Rptr. 73] (cases alleging attachment for a greatly excessive amount have been treated as actions for abuse of process); *Pimentel* v. *Houk* (1951) 101 Cal.App.2d 884, 886-888 [226 P.2d 739] (suggesting that an allegation of an attachment of an excessive amount would constitute a sufficient allegation of use of the process for an improper purpose, and distinguishing improper use of legally issued process and instituting process with malice and without probable cause); *Arc Investment Co.* v. *Tiffith* (1958) 164 Cal.App.2d Supp. 853, 856 [330 P.2d 305] ("Successive seizures of exempt property, such as the earnings of the debtor, may give rise to an action for abuse of process. . . . Wrongful use made of process rightfully issued may, as here, constitute an abuse of process.").

creditor is not entitled to the writ; (3) attaching property which is exempt from attachment or possesses a value greatly in excess of the amount of the legitimate claim; (4) using regularly issued attachment for an improper purpose.

The courts generally and correctly treat the above-mentioned first type of wrongful attachment as constituting part of an action for malicious prosecution. (E.g., *Goland* v. *Peter Nolan & Co., supra,* 2 Cal.2d 96; *Crews* v. *Mayo, supra,* 165 Cal. 493; *Vesper* v. *Crane Co., supra,* 165 Cal. 36; *King* v. *Montgomery, supra,* 50 Cal. 115; *Merron* v. *Title Guarantee & Trust Co., supra,* 27 Cal.App.2d 119.) In those cases in which the courts have articulated the reasons for the alleged wrongfulness, they have in most instances properly treated the fourth type of wrongful attachment—wrongful use of properly procured attachment—as creating an action for abuse of process. (E.g., *Spellens* v. *Spellens, supra,* 49 Cal.2d 210; *Pimentel* v. *Houk, supra,* 101 Cal.App.2d 884.) Thus the problem of proper characterization mainly arises in the second and third types of wrongful attachment cases: those cases in which the underlying action is proper but the creditor either is not entitled to a writ of attachment or attaches property which is exempt or possesses a value greatly in excess of the amount of the legitimate claim. (E.g., *Clark* v. *Nordholt, supra,* 121 Cal. 26; *Coy* v. *Advance Automatic Sales Co., supra,* 228 Cal.App.2d 313; *Harris* v. *Harter, supra,* 79 Cal. App. 190; 40 Harv.L.Rev. 502 (1927).)

Although the courts in *Clark* v. *Nordholt, supra,* 121 Cal. 26, and *Harris* v. *Harter, supra,* 79 Cal.App. 190, *described* an action based on an excessive claim and attachment as an action for malicious prosecution (see fn. 5, *ante*), they both allowed recovery in the absence of two essential elements of malicious prosecution: lack of probable cause in prosecution of the action in which the attachment issued and termination of that action in favor of the attachment defendant. The sole basis for the recovery stemmed from the excessiveness of the claim and attachment. "[T]here is a well-recognized line of decisions which allows a suit for malicious prosecution although the only basis for the action is an excessive attachment made maliciously. . . . [E.g.,] *Clark* v. *Nordholt.* . . . [I]t could be more readily explained as an adoption of the principles of abuse of process. . . . While the result of [*Harris* v. *Harter, supra,* 79 Cal.App. 190] seems clearly justifiable, *it is misleading to describe the plaintiff's cause of*

*action as one for malicious prosecution."* (Italics added.) (Note, *supra,* 40 Harv.L.Rev. 502-503.)[7]

 We believe that in view of the reasons stated below excessive attachments should be treated as giving rise to a cause of action for abuse of process rather than for malicious prosecution.[8] First, in the case of an excessive attachment action, two requirements of the malicious prosecution action may very well be lacking: absence of probable cause to institute the proceedings in which the attachment issued and termination of that action in favor of the attachment defendant. The attaching creditor typically prevails on his claim, but for a much smaller amount than the value of the property attached. Second, the wrongfulness in the excessive attachment lies, not in the institution of the suit or the procurement of the attachment, but in the illegitimate use of the attachment process to tie up more property than is reasonably necessary to secure the attaching creditor's claim. Third, the attachment defendant should not be forced to wait until final termination of the attaching creditor's action to sue for wrongful attachment: The attachment defendant should be able to assert the damages caused by the excessive attachment in the attaching creditor's primary action.

 In cases such as the instant one in which the alleged wrongfulness of the attachment does not depend upon an alleged lack of probable cause and malice in instituting the action in which the attachment issued—i.e., in cases in which the alleged wrongful attachment falls under categories (2), (3), and (4)—a termination of that action in favor of the attachment defendant has no bearing upon the determination of whether the attachment writ was maliciously procured or

[7]In holding that the complaint alleged an improper purpose but failed to allege an improper use of the process, the court in *Pimentel* v. *Houk, supra,* 101 Cal.App.2d 884, 886, explained: "It is not alleged that said attachment covered property exempt from execution [see, e.g., *Arc Investment Co.* v. *Tiffith, supra,* fn. 6, *ante*], *that it covered an excessive amount of [plaintiff's] property,* that the debt alleged to be owed by [plaintiff] was otherwise secured, or that [plaintiff] requested that the levy be made upon other property." (Italics added.) *Pimentel* therefore impliedly holds that if the plaintiff in the abuse of process action had alleged, in addition to an improper purpose in procuring the attachment, that the attachment covered an excessive amount of his property, the complaint would have sufficiently alleged "a wilful act in the use of the process not proper in the regular conduct of the proceeding" (*Spellens* v. *Spellens, supra,* 49 Cal.2d at p. 232), and therefore sufficiently stated a cause of action for abuse of process. (*Pimentel* v. *Houk, supra,* 101 Cal.App.2d at pp. 886-888.)

[8]Insofar as *Coy* v. *Advance Automatic Sales Co., supra,* 228 Cal.App.2d 313, 318-322, holds to the contrary, it is disapproved.

improperly used. The attachment defendant should therefore not be forced to wait until the termination of the creditor's primary action to seek damages for the alleged wrongful attachment.[9] "[I]t would, indeed, be extraordinary if the [attachment] defendant was denied the right in the same action, not only to defend against it, but to claim redress for the wrongs inflicted upon him by the [attachment] plaintiff . . . ." (*Waugenheim* v. *Graham, supra,* 39 Cal. 169 at p. 178.)[10]

Since cross-defendants' excessive attachment of Wolfson's property constituted the gravamen of the cause of action alleged in the fifth count of the second amended cross-complaint, the count sufficiently alleged a cause of action for abuse of process. It was not premature. The trial court erred in sustaining the general demurrer.

5. *Although Wolfson's third amended cross-complaint does not satisfy the requirements of section 442 of the Code of Civil Procedure, the trial court abused its discretion in failing to give Wolfson an opportunity to cure that defect.*

Cross-defendants interposed a general demurrer to, and moved to strike, the third amended cross-complaint. Cross-defendants did not allege, either in their notice of motion to strike or in this or any prior demurrer to the several cross-complaints, that Wolfson failed to recite facts showing

[9]Because *Division of Labor Law Enforcement* v. *Barnes, supra,* 205 Cal.App.2d at p. 346, erroneously relied on *Jeffreys* v. *Hancock* (1881) 57 Cal. 646, it held that an attachment defendant may not sue for damages arising from an alleged wrongful attachment in the same action in which the attachment issued, and to that extent it must be disapproved. *Jeffreys* involved a cross-complaint for damages from an excessive attachment levy. The court did not hold, as a matter of substantive law, that damages for wrongful attachment can never be sought in the same action in which the attachment issued, but that as a procedural matter the cross-claim did not constitute a proper counterclaim under Code of Civil Procedure section 438 or a proper cross-complaint under Code of Civil Procedure section 442. At the date of the *Jeffreys* decision, a defendant could assert a claim against the plaintiff as a counterclaim under section 438 only if the defendant's claim arose out of the transaction set forth in the complaint, or, in a contract action, if it also arose out of a contract. The 1927 amendment of section 438 eliminated the requirement as to the "same transaction," although, of course, that prerequisite presently remains a requirement under section 442.

[10]Our recognition that a cause of action based on wrongful attachment may be asserted by the attachment defendant in the action in which the attachment issued when the alleged wrongful procurement or use is independent of the legitimacy of the claim on which the attaching creditor instituted the suit will promote the policy of avoiding circuity and multiplicity of litigation which underlies the cross-claim. (*Sattinger* v. *Newbauer* (1954) 123 Cal.App.2d 365, 369 [266 P.2d 586].)

a subject matter relation between the cross-complaint and the original complaint. At the hearing on the demurrer and the motion to strike the third amended cross-complaint, however, cross-defendants did urge this defect. Wolfson did not object on the ground that the motion to strike or the demurrer failed specifically to allege the point, but argued the merits; the court therefore properly considered the issue of the propriety of the cross-complaint under Code of Civil Procedure section 442.

The trial court sustained the general demurrer to the third amended cross-complaint without leave to amend on the ground that the pleading failed to state a cause of action; it granted the motion to strike on the ground that the pleading did not satisfy section 442. Cross-defendants, however, raised this objection for the first time only at this late date, and only in relation to the third amended cross-complaint.[11] For the reasons stated below, we have concluded that although the trial court properly found Wolfson's third amended cross-complaint defective under section 442, the court's preclusion of any opportunity to correct the defect constitutes an abuse of discretion.

White's complaint pleads a common count for money due and owing. White does not allege any facts underlying the asserted debt owed by Wolfson. Wolfson therefore faced the necessity of alleging facts showing that the debt and the causes of action pleaded in the cross-complaint arose out of the same transaction. Yet Wolfson nowhere alleges any facts which identify the transaction underlying the debt alleged by White.

Nevertheless, since cross-defendants did not object to Wolfson's failure to comply with section 442 prior to the hearing on the propriety of the third amended cross-complaint, the

[11]The four counts in the second amended cross-complaint to which the trial court sustained general demurrers without leave to amend are also improper cross-complaints under section 442. The cross-defendants, however, at no time objected to their sufficiency as cross-complaints; the trial court sustained demurrers to each of these four counts for specific reasons other than failure to comply with section 442. We must therefore conclude that the trial court did not consider the section 442 defect raised by any of the demurrers interposed against the second amended cross-complaint. Defects in pleading, including the sufficiency of a pleading as a cross-complaint under section 442 (*Smart* v. *Peek* (1931) 213 Cal. 452 [2 P.2d 380]; *Johnson* v. *Taylor* (1907) 150 Cal. 201 [88 P. 903, 119 Am.St.Rep. 181, 10 L.R.A. N.S. 818]), are cured by waiver when the opposing party does not interpose timely objections. Thus, cross-defendants waived any objection under section 442 to these four counts of the second amended cross-complaint.

trial court should have given Wolfson at least one opportunity to amend his cross-complaint to cure this omission. The trial court should have sustained the demurrer, not the motion to strike, on the failure to comply with section 442, but afforded an opportunity to amend.

 Since failure to comply with section 442 constituted cross-defendants' principal contention in support of both the general demurrer and the motion to strike, the motion merely duplicated the general demurrer and thus performed no function. The more acceptable method of attacking the sufficiency of a pleading as a cross-complaint is by demurrer rather than by motion to strike. The motion to strike has traditionally been, and should continue to be, invoked to attack defects not apparent upon the face of the pleading. (*Lincoln* v. *Didak* (1958) 162 Cal.App.2d 625, 630 [328 P.2d 498].) The trial court should therefore have denied the motion to strike as superfluous and sustained with leave to amend the general demurrer on the ground that the third amended cross-complaint failed to satisfy section 442.

6. *Wolfson's third amended cross-complaint states a cause of action under section 12 of the 1933 Securities Act against cross-defendants Basin and Shaft.*

The third amended cross-complaint sought rescission of the White stock purchase on two grounds under the 1933 Securities Act (15 U.S.C., §§ 77a-77aa). The first cause of action seeks relief under section 12(1) of the Securities Act (15 U.S.C., § 77*l*). That section declares the civil liability of any person who offers or sells stock in violation of the registration or prospectus provisions of section 5 of the act (15 U.S.C., § 77e). The second count seeks relief under section 12(2) of the Securities Act, which permits rescission of a stock purchase with the requisite jurisdictional basis if the sale is made by means of a misrepresentation of a material fact.

 Turning initially to the first cause, we note that, although section 5 on its face applies to all sales of stock through interstate facilities, section 4 (15 U.S.C., § 77d) lists certain exceptions to its operation. Section 4 provides that section 5 does not apply to ''[t]ransactions by any person other than an issuer, underwriter, or dealer,'' or to ''transactions by an issuer not involving any public offering.'' Wolfson has not alleged that cross-defendants Shaft and Basin are underwriters or dealers or that White is in any way

354

involved so as to make the sale by Basin of its White shares a "transaction by an issuer."

The purchaser of stock, however, does not bear the burden of pleading the inapplicability of the section 4 exemption. The federal cases hold that the party claiming the benefit of the exemption carries the burden of proof on this issue. (*Securities & Exchange Com.* v. *Ralston Purina Co.* (1953) 346 U.S. 119, 126 [97 L.Ed. 1494, 73 S.Ct. 981] ; *Securities & Exchange Com.* v. *Van Horn* (7th Cir. 1966) 371 F.2d 181, 187.) We apply the general rule that the burden of pleading follows the burden of proof. (See 1 Loss, Securities Regulation (2d ed. 1961) 712-713.)

Since Wolfson does not bear the burden of pleading that cross-defendants are not exempt from the operation of section 5, we must decide whether he states a good cause of action against the cross-defendants. As we shall explain, he states such a cause only against Basin and Shaft. He fails to do so against White because he does not allege that White took any part in the transaction or "controlled" Basin or Shaft. (See section 15, 15 U.S.C., § 77o; 3 Loss, Securities Regulation (2d ed. 1961) 1693.) And Wolfson nowhere mentions cross-defendant Beber in his third amended cross-complaint. The trial court therefore correctly sustained demurrers without leave to amend as to White and Beber.

 Wolfson does allege sufficient facts to state a cause of action under section 12(1) against Basin. Wolfson alleges that Shaft and Basin "by means of the instruments of transportation and communication in interstate commerce" called him to a conference at the office of White. During this conference Shaft made certain representations with regard to White stock owned by Basin; these representations induced Wolfson to purchase 5,000 White shares at $3 per share from Basin. No registration statement was either filed or effective with the Securities and Exchange Commission at this time. Wolfson further alleged that thereafter Basin "caused to be carried through the United States mails . . . for the purpose of delivering . . . after sale" the 5,000 White shares which "were at no time accompanied by a prospectus meeting the requirements of Section 10 [15 U.S.C., § 77j]." Wolfson finally alleged that he was "ready, willing and able to tender the purchased securities to cross-defendants." Assuming that the above allegations make out a prima facie violation of section 5, they sufficiently state a claim for relief under section 12(1) against Basin. (3 Loss, *op. cit. supra*, at p. 1692.)

██ "To make out a prima facie case under [the registration provisions of] § 5 in order to authorize § 12 relief, the [purchaser] must establish: (1) there was a sale, or offer of sale, of a security; (2) there was no registration statement in effect at that time; (3) the sale was enhanced by the use of interstate transportation or communication, or the mails." (*Lennerth* v. *Mendenhall* (N.D. Ohio 1964) 234 F.Supp. 59, 63.) ██ Wolfson alleged that the White securities were unregistered at the time he was induced to buy them from Basin, thus satisfying the first two requirements. Wolfson's allegations that Basin and Shaft called him by means of the facilities of interstate commerce to a conference in the course of which Shaft induced him to buy the shares, and that thereafter Basin delivered the shares to him through the United States mails, satisfy the third requirement. (*United States* v. *Kane* (S.D.N.Y. 1965) 243 F.Supp. 746, 750; *Lennerth* v. *Mendenhall, supra,* 234 F.Supp. at p. 63; see generally, 1 Loss, *op. cit. supra,* at pp. 210-211.) Wolfson therefore sufficiently alleges a violation of section 5 for purposes of seeking section 12(1) relief.[12]

Wolfson also alleges sufficient facts to state a cause of action under section 12(1) against Shaft even though Shaft did not own the 5,000 White securities offered and sold to Wolfson in violation of section 5. Wolfson alleged that both Shaft and Basin called him to the conference and that Shaft made the solicitations and representations which induced him to buy the 5,000 White shares from Basin. ██ A person who actively participates in a sale by soliciting an offer to buy and making the representations upon which the purchaser of the securities relies, may be liable under section 12 as a seller even though he is not the owner of the securities. (*Cady* v. *Murphy* (1st Cir. 1940) 113 F.2d 988, 990-991; *Lennerth* v. *Mendenhall, supra,* 234 F.Supp. at p. 64; see generally, 3 Loss, *op. cit. supra,* at pp. 1712-1717.)

In the second count of the third amended cross-complaint Wolfson seeks relief under section 12(2) of the Securities Act.

---

[12]Wolfson does not explicitly allege that no registration was in effect at the time Basin used the mails to deliver the White shares. If the shares were not then registered, Wolfson could claim section 12(1) relief for a violation of subsection (a)(2) of section 5. If the shares were registered at that time, then Wolfson's allegation that the shares "were at no time accompanied by a prospectus meeting the requirements of Section 10" suffices to make out a prima facie case of a violation of subsection (b)(2) of section 5. Wolfson's allegations in their present form make out a prima facie violation of subsections (a)(1) and (c) of section 5: the offer and sale as opposed to the delivery provisions.

That section permits rescission of a stock purchase with the requisite jurisdictional basis if the sale is made by means of a misrepresentation of a material fact, whether or not the sale violated section 5.

 Wolfson's following allegations sufficiently state a cause of action under section 12(2) against both Basin and Shaft:[13] that Shaft and Basin, "in the course of offering the securities of White through the means and facilities of interstate commerce and the United States mails," represented to Wolfson that Basin paid $3 per share for the White securities and that they would soon rise in value to $15 per share; that in fact Basin had paid $2.10 per share and Shaft and Basin had no reasonable basis for representing that the White shares would rise in price to $15; that Wolfson, "not knowing of such untruths, and as a direct result of such solicitations and the untrue facts contained therein," purchased 5,000 White shares from Basin at $3 per share; and that "said securities were subsequently delivered to [Wolfson] through the agency of the United States mails." (See 3 Loss, *op. cit. supra,* at pp. 1699-1708.)

Since Wolfson alleged sufficient facts in both the first and second counts of his third amended cross-complaint to state a cause of action under subsections (1) and (2) of section 12 of the 1933 Securities Act against Shaft and Basin, the trial court erred in sustaining general demurrers, without leave to amend, to the third amended cross-complaint as to these two cross-defendants.

The judgment of dismissal in favor of cross-defendants White and Beber is affirmed as to the two counts of the third amended cross-complaint. In all other respects the judgment of dismissal is reversed and the cause is remanded to the trial court with the following instructions: as to counts one, two, four, and five of the second amended cross-complaint, to overrule the general demurrers and to rule on the points presented by the special demurrers to counts one, two, and five,[14] and as

---

[13]Shaft may be held liable for the amount of the purchase price under section 12(2) as an active participant in the sale of the White shares owned by Basin. (*Cady* v. *Murphy, supra,* 113 F.2d 988, 990-991; *Lennerth* v. *Mendenhall, supra,* 234 F.Supp. at p. 64; see generally, 3 Loss, *op. cit. supra,* at pp. 1712-1717.) For the same reasons given in connection with the first count of the third amended cross-complaint, Wolfson does not state a cause of action in his second count against White or cross-defendant Beber.

[14]The fourth count of the second amended cross-complaint is a common count and is therefore not subject to a special demurrer.

to the fourth count, to grant reasonable time within which cross-defendants may answer if they are so advised; as to the third amended cross-complaint, to vacate the order granting the motion to strike and, as to cross-defendants Shaft and Basin, to grant Wolfson a reasonable time within which to file an amended cross-complaint if he is so advised.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment of the trial court in its entirety for the reasons expressed by Mr. Justice Fleming in the opinion prepared by him for the Court of Appeal in *White Lighting Co.* v. *Wolfson* (Cal.App.) 59 Cal.Rptr. 598.

The petition of respondents Shaft and Basin for a rehearing was denied May 1, 1968, and the opinion and judgment were modified to read as printed above. McComb, J., was of the opinion that the petition should be granted.